We'll hear argument first this morning in Case 18-1059, Kelly v. United States. Mr. Roth. Mr. Chief Justice, and may it please the Court, once again, the government is trying to use the open-ended federal fraud statutes to enforce honest government at the state and local levels. Its theory this time is that the defendants committed property fraud by reallocating two traffic lanes from one public road to another without disclosing their real political reason for doing so. This theory turns the integrity of every official action at every level of government into a potential federal fraud investigation. It end-runs McNally and Skilling by subsuming honest services fraud within property fraud and by criminalizing ulterior motives even without bribes or kickbacks. It would affect a sweeping expansion of federal criminal jurisdiction into a particularly fraud area. This is not the law. This Court in Cleveland held that regulatory authority is not property. So an official who induces a sovereign decision through deceit has not obtained property by fraud. Only when the official lies to divert state resources to private use has he stepped outside the regulatory realm and committed property fraud. This rule distinguishes property fraud from honest services fraud and from routine political conduct. Here, because the defendants simply reallocated the traffic lanes from one public use to another, the port authority at most was deprived of regulatory control, not property. And that's true regardless of whether, as the government now alleges, the defendants lacked the authority in some sense to order the realignment. Mr. Levy will explain why the government is wrong to say that, but it's ultimately legally irrelevant, because the fraud statutes do not prohibit lying to take unauthorized State action. They prohibit lying to obtain property. And that simply is not what occurred in this case. Ginsburg. You said that if the resources were diverted to private use, then the prosecution would be okay. But why isn't it a private use to benefit defendants politically? Your Honor, I'm trying to distinguish the use of the property from the motive for the decision. So here, the decision was to realign the lanes from one set of public drivers to another set of public drivers. Both are public uses of the lanes. Now, it's true the motive, the alleged motive, for that regulatory decision was improper. It was political, right? That's the allegation in the case. But that doesn't mean that it's that the use of the lanes was private. It's not, Your Honor, the typical case in which the government has prosecuted property fraud against a public official is where the official lies to take property from the government for his own use. So a situation where you lie on your expense report, you say you incurred this expense for business reasons and you did not. In that situation, you're lying and you're taking the property away from the government for yourself. That is obtaining property. Here, what the defendants influenced through their deceit was the decision about the alignment of the lanes. And if there's anything that is regulatory in nature ---- Kagan. So, Mr. Roth, on that theory, would it or would it not make a difference if the defendants here, rather than doing everything that they did for a political reason, if they had done it to make their commutes easier or their families' commutes easier? So it wasn't anything about politics. It was their own personal interests. But they did exactly the same thing. Is that covered or is not ---- is that not covered on your theory? On my theory, that is certainly not property fraud. The officials, even in that case, have not obtained property by fraud. Kagan. So you're not making just a distinction between private uses and public uses? You know, private purposes and public purposes, maybe. I'm certainly not making a distinction between the type of purpose. What I am trying to distinguish is the use of the property. And is it a regulatory decision to realign the lanes for whatever purpose? Because if what we're concerned about is the integrity of the purpose behind the decision, that really sounds in honest services fraud. Right? Because what we're concerned about is not the government being cheated out of property that it has or that it owns. What we're concerned about is the good faith of the official in making the decision. That's a hard ---- it can be a hard line to draw. I mean, if the rerouting of the traffic is done for commercial benefit of the individual in whatever way, that would be a violation, right? We are ---- But he's got a, you know, a development or something. He's building a hotel in Fort Lee, and he wants the traffic redirected there or directed away from, whichever, because he thinks it will increase business at his hotel. Your Honor, if the Court were to consider that as a kickback, then that would be honest services fraud. It would not be property fraud, because, again, the decision there is a public ---- is a decision about allocating scarce public resources among public uses. Again, the concern in Your Honor's hypothetical is, well, what ---- was it a good reason? Was it to benefit the public, or was it to benefit himself? And what this Court said in Skilling is if you make the decision because you were paid a bribe or because you're going to be getting a kickback, that is a violation of your honest services ---- your duty to provide honest services to the public. We ---- what we're doing here is interpreting a statute. And it's not quite clear to me how your argument fits into the language of this statute. So property ---- money is property, and money was lost. So how does this fit into the language of the mail fraud statute ---- the wire fraud statute? So Your Honor is correct. The relevant word is property, and the second relevant word is obtain. And this Court in Cleveland explained that when the government is making sovereign decisions and its capacity is sovereign, implicating its regulatory interests, that is not property within the meaning that Congress had when it enacted it. Alitoso, was there a loss of money in Cleveland? Well, there wasn't ---- it's not clear if there was a loss of property. Certainly, I would say there was an official in that case who was processing the fraudulent application. And if he had not been given the fraudulent application to process, he would have been doing useful work for the agency. And maybe he would have gone home an hour earlier and been paid a little bit less. I don't think any of that would have mattered to the result in Cleveland. Because it's all of that ---- Still, how does it fit in the statute? Is it that there isn't ---- property isn't obtained when it is simply wasted? Is it that ---- does it ---- is it a gloss on the word defraud? I think it's two steps, Your Honor. The first step is to establish that the decision, the realignment, is not property, because that's control. That is regulatory power. The second step is to say, well, then what about the costs of implementing it? And I would say the costs of implementing that regulatory decision are part and parcel of it, and it's the scheme is not to obtain that property. The purpose of the scheme, the object of the scheme, is to effect this policy decision, this regulatory decision, in the way that the officials want. So in the case of sending city snowplows to clear your own house first, or sending city maintenance people to paint your own house if you're a public official, I was under the impression that you thought that that would be a crime. Is that right? If you're sending the public employees to do private work, yes, absolutely. That's not regulatory. At that point, you're just taking the city property and using it for private use, which is not that's you're obtaining the property. I would distinguish that, though. Kagan. So even though both are diversions of city resources or State resources, whatever it is, it's just one is regulatory and one is not because one involves personal benefit? Personal use. Yes, Your Honor. I mean, every regulatory decision diverts resources in some way. I mean, every time a public official makes a decision, there are implications for the bureaucracy and there are implications for public property. So there is diversion going on, and maybe the decision was made for a bad reason. And if it's a bad enough reason, maybe it's an honest services violation. Is your theory that the word obtain is what does the work in response to Justice Kagan's hypothetical? I think it's obtaining property together. I don't necessarily think it's one or the other. Cleveland focused on property, and what did Congress mean when it said property? I think it said we are concerned with cheating people out of their property rights. And you can do that with a government entity. You can certainly cheat the government out of its property. Pasquantino is the example of that, where the Court said you owe tax revenue you owe taxes to the government, you lie to avoid paying your taxes, you've committed property fraud. The same, by the way, could occur in a Port Authority situation. You owe a toll, and you lie to evade paying the toll, you have cheated the government out of property that it's owed. But if what you're doing is making a regulatory decision, like allocating public resources among public uses, and there's no question that the main line is a public use just as much as the special access roads are a public use of the property, that is not obtaining property. Alito, I can understand the distinction between a regulatory decision and the deprivation of property when the regulation, when the regulatory decision doesn't cause a loss of property. But when the regulatory decision causes a loss of property, I find it more difficult to see the distinction. Explain it to me. Your Honor, I think that every regulatory decision is going to have some consequences for public employee time, for example, which is the species of property that the government has invoked. But in this case, let's take this case just as an example. What they focus on, the additional money that was spent was the tollkeeper. The tollkeeper had to do an additional shift. But the tollkeeper was doing her job of collecting tolls for the public. So the Port Authority was not deprived of her salary. She was earning her salary. The objection is, if this regulatory decision had not been made, we would not have had to hire that tollkeeper for that work. Alito, well, I'll try this one last time. Tell me how this fits in. When we write the opinion, if we were to write one in your favor, how would we explain your result within the language of the statute? I think the Court would say the statute prohibits schemes to obtain property when you are using deceit to influence a regulatory decision, to change a regulatory decision, that is not obtaining property. And the corollary that's important is the costs of implementing a regulatory decision don't change the result. I think I'll try mine once more, too, Mr. Rothen. Why, when a public official says to a city maintenance worker, you should paint my house before you do anything else, why isn't that similarly an allocation of property or an allocation of resources? Because it's not the job of the government to do it. I mean, it benefits me, but, you know, I get to send, whether it's painting or snow plows, you know, you go plow my street first. Right. Why isn't that an allocation of city resources? Let me try to clarify, because I think I may have led to some confusion. If you're plowing public roads, and you say, I want to plow my street first or my neighborhood first, that is not obtaining property by fraud, because that is an allocation of resources to a public use. It's a public use that happens to benefit you, and maybe that was your motive, and that's very bad, but it's not obtaining property by fraud. If you, instead, trick the public employees not into plowing the public road, but into plowing your private driveway, which is not the job of the government, right, that's not what the government does. The government is concerned with public property and clearing public property. If you trick the employees into plowing your private driveway, then you have taken their services for your personal use, which is fundamentally different. That's no different from saying, I worked overtime when you didn't. Please pay me, you know, my hourly wage for the hour time that I didn't work. And that difference is, just to go back to Justice Alito's question, where in the statute? The difference is in the scheme to obtain property. That's where it is in the statute. And so you look at what is the object of the scheme. And if the object of the scheme is to influence a regulatory decision, it's not a scheme to obtain property. That just follows from Cleveland. Otherwise, every decision that public official makes is on the table, and the only thing that is separating the scheme from the public official is the scheme to obtain property. If that was the scheme, and you defrauded the use of government property to accomplish your goal, why is that any different than taking the maintenance worker to plow your road, your private street? Your Honor, the difference is that here, the alleged purpose, the alleged motive was what Your Honor said, right, to increase traffic. That was the scheme. Yes. The scheme was to do that through a regulatory decision, right, by realigning the lanes from one public use to another public use. So what we're – what the objection is to the conduct here is an objection to the purpose, not the objective use of the property. That's the difference. The problem is it's – I don't think I can see a headline that would say it's okay for officials to use government public money in a way that is plainly unauthorized, not just in its motives, but it's in end use. And an official can and should not be – should never be liable for that. Our public officials now can use government resources for their private ends. Right. Your Honor, all – Not mixed motive, which is the interesting question here with the traffic study and whether you have enough – whether they have enough evidence that there wasn't a traffic study, but you're saying what it was – what the government has said, you're not authorized to do it. There's a question about that. Yeah. And you didn't have even a mixed motive. You had only a personal motive. So, Your Honor, I'll let Mr. Levy speak a little bit more length about unauthorized, because actually the government's theory throughout the case was that he did have the authority and that he abused his power by making the decision. A much more difficult question. Yeah. But what I will say is I'm not trying to suggest that this is okay. Okay. We don't want public officials acting for personal reasons. We don't want them acting necessarily for partisan or political reasons. But what I'm saying is the remedy for that is not the Federal property fraud statutes. We have certainly political remedies that were very much – had pretty substantial repercussions here. There may also be State law constraints on official abuses of authority. In fact, New Jersey has a statute called official misconduct that is specifically directed toward unauthorized decisions with bad purposes. That's not what the Federal property fraud statute is concerned with. The Federal property fraud statute is concerned with cheating the government out of its property rights. And that's just not what we have here. What we have here is an abuse of power, a political abuse of power, and that's – if anything, again, that sounds in honest services fraud, which this Court has limited due to vagueness concerns to bribes and kickbacks. Your Honor, if there are no further questions, thank you. Thank you, counsel. Mr. Levy. Mr. Chief Justice, and may it please the Court. A public official who is acting politically and not for personal gain does not commit fraud by lying about his reason for an official decision. If the decision was generally within his authority, the government disputed that below but now urges that as the rule in this Court. That concession requires reversal. The government alleged and proved that Mr. Brony was the co-head of the Port Authority, responsible for supervising all aspects of its operations. The government itself elicited that there was never any policy that precluded Mr. Brony from using his plenary authority to alter a traffic pattern. For the government's rule to work, this Court should require an objectively clear lack of authority, something not even arguably shown here. Otherwise, any official who conceals his political motivation risks being convicted of fraud if a prosecutor or jury later disagrees about the scope of his authority. If the government's rule is to provide any limits, this case must lie beyond those limits. I'd like to begin by discussing what the government alleged, argued, and proved below about Mr. Brony's authority before it decided in this Court that an official's authority is the line between guilt and innocence under the fraud statutes. In the district court, the government alleged in the indictment that Mr. Brony was responsible for the general supervision of all aspects of Port Authority business, including the operations of its transportation facilities. From its main cooperating witness, Mr. Wildstein, the government elicited that exact statement precisely, ticking off one of the allegations from the indictment. It elicited from Mr. Wildstein that the title Deputy Executive Director was a misnomer that within the Port Authority structure, the Deputy Executive Director and the Executive Director had a 50-50 split in terms of power-sharing, that the Deputy Executive Director was not the number two position within the Port Authority. That's from the government's eliciting from its own cooperating witness. The government also found the arrangement is always that there's a New York representative who's the Executive Director and the New Jersey representative who's the Deputy. Is that right? That was, at the time, the arrangement. It was always appointed by the Governor of New Jersey for the Deputy Executive Director and the Governor of New York for the Executive Director. And it was understood within the agency by everyone. All the witnesses the government called testified that that was the arrangement. They called Mr. Brony's successor, who testified that that was the arrangement, that one did not report to the other. And that that's the case. Alito This is a bi-State agency. Why would New Jersey agree to an arrangement like that where its representative is always in the second seat, at least nominally? Is it just the big brother across the river? Is that the case? Fisher I don't know the answer to that, except that the structure within the Port Authority was that that was not the case. So they, in fact, as it actually played out, didn't agree to play second fiddle. It was understood that within the Port Authority, the Deputy Executive Director had equal authority. The Vice Chairman testified about these parallel chains of command that were understood. Particularly for decisions made within New Jersey, it was understood that that would fall within the Deputy Executive Director's scope of authority. Sotomayor I think one of the government's main arguments on the sufficiency of the evidence, which is fairly pro-government in this situation, was that Mr. Wildstein had to lie to the Port Authority employees about the Executive Director knowing about this lane change. If, in fact, the reality of the situation was that Mr. Barone couldn't do this without the Executive Director's acquiescence or acceptance, doesn't that show his lack of authority? Why isn't that sufficient evidence?  So two things, Your Honor. First of all, I don't believe we're here on a sufficiency ground and for reasons that we've argued on our reply brief. But even within that, we're not saying that the lie might not be a piece of evidence. But even the government concedes in this case that the lie does not show a lack of authority. The government concedes that an authorized official is permitted to lie to their subordinates, and so it cannot be that circularly that lie automatically establishes the lack of authority. Here, all of the evidence at trial was that Mr. Barone had plenary authority over the operations of the Port Authority. Mr. Wildstein actually testified his first answer when he was asked, why did you come up with this traffic study? His first answer was for purposes of the media and for purposes of explaining it to local officials. When pressed by the government, he said also to give a reason to career officials. But the fact that he has to, not that he has to, that he chooses to tell a lie to career officials to make this go over more smoothly in the same way that a public official wouldn't tell the world that they're doing something for a political reason. Would you spend a moment on the traffic study? Certainly, Your Honor. The government has conceded that if Mr. — and again, this is new in this Court, all of these concessions — that if Mr. Barone had authority to order a traffic study, then he could do so even with the intention of causing traffic in Fort Lee. And they concede that he had the authority to order a traffic study. So all of that is conceded. What they say is he lied about the existence of a traffic study. And as we point out in our reply brief, there was no lie about the existence of a traffic study. There was no representation at all about the existence of a traffic study. Mr. Wildstein went to the bridge supervisors and told them, I would like to know what will happen, what the effect on traffic will be if we switch these three lanes — please switch these three lanes, or maybe not with the please — and study the results. Collect the numbers and tell me what the results are. The only part of that is a representation is the first part. I would like to know my motivation is, my purpose is. And the government agrees that's not capable of being the lie for purposes of a fraud conviction, a money and property fraud conviction. The other two parts are an instruction. They were an instruction to do a traffic study. And the employees of the Port Authority did that. That's what the government spent a great deal of time at trial proving, is that money was spent on a traffic study that they say was illegitimate because nobody ever cared about the results. But the government agrees now that caring about the results is not an issue. They say the traffic study didn't exist. And that's just flatly contrary to what's true. Mr. Levy, is it your position that — suppose Mr. Barone had said, I'm giving you no reason at all, or suppose Mr. Barone had said, we're going to do a traffic study, but it's going to be a sham traffic study. Would he still have had authority? Certainly the first one. He certainly had at any point the discretion to say, as somebody had done very early on in creating these three traffic lanes — they weren't required by anything — at any point in time could have said, I think they should have a fourth, or I think they should have only two, or only one, and that was fully within his authority. And as the government argued and proved this case below, that was their point. That was their summation, was he abused the authority he was entrusted with. And the second, we're going to do a sham traffic study. I think he can do that. I think as a functional matter, who knows what actually results from that. But yes, he has the authority to say, we're going to do a traffic study because I want to do this thing, and for public reasons, it's easier to do a traffic study. And you said that this was not a sufficiency question. But what is it if it's not a sufficiency question? Because as I understand your arguments, you're not pointing to any instruction that was incorrect or to the rejection of an instruction that you offered. So how are we to look at this other than through a sufficiency lens? Frankly, the most obvious way to do it is as a government forfeiture of the issue. The defendants in the district court said the line is authority, and if we were authorized, then that is a complete defense. And the government told the district court, do not give that instruction. And the district court said, I'm not giving that instruction because it is not a defense, and I don't want to confuse the jury into believing it is. Now, in this court, the government is saying, actually, it turns out the hinge between guilt and innocence is whether or not he was authorized, and we get the benefit of a sufficiency of the evidence deferential review, even though we told the district court that this issue didn't matter at all. The government has forfeited the opportunity to prove that Mr. Barone lacked authority. We offered to have that fight in the district court, and they said it didn't matter. Now, in this court, this court should assume that there was no lack of authority. Any reason to think that the jury actually made a finding about Barone's authority? No. There's no reason whatsoever. The district court was attempting to make sure that they didn't consider that to be relevant, right? That was what we pressed, was that this is the relevant distinction. And the district court wanted to be sure that the jury did not believe that it would be a defense, and nothing in the jury instructions suggested that it would be a defense. Thank you. Thank you, counsel. Mr. Fagan. Thank you, Mr. Chief Justice, and may it please the court. The defendants in this case committed fraud by telling a lie to take control over the physical access lanes to the George Washington Bridge and the employee resources necessary to realign them. Unless they lied about the existence of a Port Authority traffic study, none of them had the power to direct those resources and realign the lanes. Because they told that lie, those resources were answering to them, to their own private purposes, rather than to the public officials who were duly appointed to decide what those resources should be allocated to do. Their actions in this case were fraud in just the same way that it would be fraud for someone with no connection to the Port Authority to impersonate Port Authority supervisors and order Port Authority employees to realign Port Authority lanes. Or, if we want to put this in the private context, for someone to usurp the authority by deception of a taxi cab company's dispatcher and order the cabs and the drivers to go wherever the fraudster pleases. They don't get a free pass simply because Barone worked for the Port Authority when the evidence showed that he didn't have the power to direct these resources in this way without telling the lie. They don't get a free pass because they're hypothesizing that legitimate decision makers might, in theory, have decided to realign the lanes when the precise point of their scheme was to take these resources out of the legitimate decision makers' hands and put them into their own hands. And they don't get a free pass simply because their motive happened to be political. Let me start with the legal argument that was made by Kelly's counsel, which seems to be drawing a distinction between public uses and private uses. And I think there are two main problems with that. Actually, probably three. One is I don't see where license for that is in the statute. And that gets me right to the second problem, which is that it seems to draw a distinction between fraud where the victim is a public entity and fraud where the victim is a private entity. And the Court rejected that distinction in Pasquantino. I don't know in the taxicab hypothetical what it means to say that it's only fraud if those cabs then go to private use. We're talking about a private company in that context. And the third problem is I don't know how a jury — I think some justices on this Court were grappling with this — I don't know how a jury decides the difference between a public and a private use. That would be — Breyer. How do you — I mean, you have two separate points, I think. One is your statement now, which I think is stronger than in your brief, that if you have authority and you work for a government, only if you say and tell them a lie and untruths, then you don't have authority. My goodness. The Code of Federal Regulations, the rules of any department, the — I mean, the government is filled with rules. And there are numerous instances where a person might say something untrue about something related to a rule that gives him authority for that. That's enough to take — we're back to honest services. And that's also true of the second. If, in fact, I can — there are two separate parts to the second. I might as well get both questions out. Is that fair? The one on authority is I don't know where that comes from, that if you have authority to do something in government, but you can't, where you lie about some — anything that you wouldn't without it, well, then you're in the property-stealing statute. And the second problem with your second claim is if you don't have authority, but you put what you take to a public use — now, either that is, does, is, is a conversion of property and a — a obtaining of property within the statute, or it isn't. If it is, I don't see how honest services fraud is not back in the statute, which has been ruled out since McNally. And if it isn't, I don't see how this case works. MR. GOLDSMITH. Your Honor, let me answer the second part of your question first, and then I'll try to get back to the first part. To answer the second part of your question, I don't — as I was saying, I don't think their distinction between private and public uses works, because that's not a distinction that the statute draws. It's not a distinction you could draw — JUSTICE BREYER. Then we're back to — you know, my point was, why then? We're back to honest services. MR. GOLDSMITH. There is no deprivation of honest services that does not require somebody in the government to spend some time or use some paper or use a telephone in order to achieve that dishonest thing. All right? If you're going to count that as property, well, fine, you could do it, I guess, under some statute. But if you do it under this statute, this statute then prohibits the taking of dishonest services, exactly what the Court has held it doesn't do. So, Your Honor, if I might answer that, it will take me a second to play this out, but I think it's a very important distinction. They are trying to lump a bunch of different kinds of frauds together and make them all sound as if they're the same. This case is about a very specific kind of fraud, commandeering fraud. It is when the defendant tries to take over property that is in the hands of the victim and manage it as if it is his own property. That's what they were doing with the lanes on the bridge and the employee resources. So, for example, if there's a snowplow sitting there and I take the keys to the snowplow and I drive off in the snowplow, everyone would agree that I've obtained the snowplow. If I instead put on one of those masks from the Mission Impossible TV show or the movie and I impersonate the boss of the snowplow driver and I tell the snowplow driver to drive around in the snowplow and do the exact same thing that I was going to do, I have obtained the snowplow and the driver's services by fraud. But not every fraudulent scheme and not every deceptive scheme works that way. Sometimes there are deceptive schemes in which somebody simply wants an agency to do something or wants a private victim to do something on his behalf. And then you have to look at what is actually the object of the scheme and how the scheme works to see if the agency is deprived of property. But the basic difference between taking the snowplow is that the official has no authority to take the snowplow for his private uses. The official does have authority to regulate how lanes are used on the highway and say these are going to be used for Fort Lee, these aren't. Well, first of all, Your Honor, Barone did not have that authority in this case. And I can get to the evidence. Well, that's disputed. I can get to the evidence of that in a second. But also, I don't think that it's fair to call this a public use. What we would say is a public use is the use to which the legitimate supervisors of the Port Authority have decided to put the Port Authority at risk. Okay. So what you're saying, your theory is that by the actions in this case, they have commandeered the lanes on the expressway? Yes, Your Honor. They commandeered the lanes and the resources necessary to reallocate. They're still being used for public purposes. Your Honor, I'm not sure what they mean when they say they're being used for public purposes. Is it normal that people want to use the highway to get to Fort Lee? They can, but they have nothing to do with the scheme at all. So, Your Honor, I guess I would push back on this to this extent. If they decided to close the bridge, is that a public use or private use? If they decide that only Kelly can use that lane, is that a public use or a private use? If they decide that only red cars can go down that lane, is that public or private use? They didn't decide any of those things. They said anybody. It was just a problem getting there, which was quite a problem, I grant you. Quite a problem. But they used it for cars going down. Well, snowplow. Hey, there's a law here. A rule. A rule. No, a rule. Treat every street alike. And you know what the snowplow operator did? He snowplowed the mayor's street first. Now, that is not a good thing to do. It is really undesirable. And maybe it should be a crime. But 30 years in prison? That, I'm not sure. And this statute has to do with property fraud and is taking the snowplow and putting it to the use of the public streets in violation of a rule, treating the mayor better. Is that a property crime? Your Honor, in that hypothetical, we would not say that is fraud. There is no lie. There's nothing material. Oh, of course there is. Where are you going? I am going to Fifth Street first. And then I will go to the grocery store at the street. And then I—ah! And you know what he did? He went to the city councilman's street. All right? There's a lie. It's easy to make up cases that there's a lie in. And that's my problem. Same problem. We're back into honest services fraud, which is fraud and bad. And the question is, does this statute get it? We are not in honest services fraud, Your Honor. First of all, the lie in your hypothetical was not a lie that was told to obtain property. It was just a lie about what he was going to do. But here's the reason we're not in honest services fraud. They wouldn't have given it to him if they— In the honest services fraud cases, in McNally, for example, there was no dispute that the defendants in McNally had the authority to decide who was going to insure the state of Kentucky. Well, Mr. Fagan, can I—this is what troubles me about your argument. Your argument is that if Barone was authorized, he could not be convicted. Am I right? Yes, if Barone had the authority to do what he did, then he's not committing fraud, even if he tells a lie. Okay. And you say that takes care of a lot of these hypotheticals that seem—that are disturbing to some people. You say, but the jury found that he was authorized, and there's sufficient evidence to support that finding. The jury found he wasn't authorized. I'm sorry. The jury found he was not authorized, and there's sufficient evidence, viewing the evidence in the light most favorable to the verdict to support the finding. But I see no indication whatsoever—no reason to believe the jury made any such finding. I've read these jury instructions several times. There's nothing in there that would alert a jury—a juror to the obligation to find that Barone was unauthorized, unless I missed something. Your Honor, let me say a couple of things about that. One, they did not make an objection to the jury instructions properly in the court of appeals. It's not part of the question. No, I know that. But I've never— Okay. I've never seen a criminal case where we're asked to defer to a jury's finding on something that the jury didn't find, putting aside the question of whether there's any evidence to show that he lacked authority. So let me point you to a couple of places, and then let me talk a little bit about the evidence of lack of authority. First of all, there's the instruction that the court of appeals deemed adequate, and that's at page 875 of the Joint Appendix, which is the instruction on obtaining property, which the court of appeals deemed sufficient to notify the jury that when someone is acting on behalf of an organization, acting as the agent of that organization, he's not obtaining property when he exercises the authority that the agency has duly conferred on him. But even better than that is the materiality instruction from pages 875 to 876, which says that if you find that the representation that the lane and toll booth reductions was for the purpose of a traffic study was false, you must determine whether that representation was one that a reasonable person might have considered important in making his or her decision to commit Port Authority resources for that endeavor, including the services of Port Authority personnel. What does that say about authority to reallocate the lanes? If Barone actually had the authority to reallocate the lanes for any reason or no reason, as his counsel just stated to this court that he did, I don't see how the jury could have found that the lies that they told were material. Barone could have— Mr. Feigin, everybody has authority to spend or do their act on behalf of the agency. Anybody who does it for their own personal purposes is unauthorized. So it's meaningless to say is he authorized or not. Did he have the authority to close the lanes under certain circumstances? Well, Your Honor, I don't— Did he have authority to close the lanes on his own say? He might have, Your Honor. What he didn't have was the authority— Did you prove that he had limited authority? Where did you prove that? We proved that he did not have the authority to close the lanes under these circumstances without telling the lie. I can explain why if you'd like. When Wildstein first proposed the idea of realigning the lanes, Barone's immediate response was to ask Wildstein how he was going to do that. Wildstein then came up with the idea that they would have a traffic cover story—the cover story of a traffic study. And he explained at the time to Kelly that one purpose of the traffic study cover story was in order to enlist the Port Authority officials that they would need in order to He then had to lie to both the manager of the George Washington Bridge and the manager of tunnels, bridges, and terminals that the executive director was aware of this and apparently had tacitly approved of it, where, in fact, they were absolutely concealing it from the executive director. Wildstein— By the way, if, contrary to their expectations, there had been no slowing of traffic, and, in fact, the lanes—on one lane, traffic remained the same or maybe improved, would you still have a case here? Yes, Your Honor. It's not about the effect of it, although the effect was catastrophic, and that was a reason why the prosecution was brought, because of the incredible danger in which they put the citizens and commuters of Fort Lee. But they would still have committed the same crime. And they were hiding it from the executive director. Wildstein testified directly that there were processes in place to use the Port Authority resources, and he didn't follow them. And when the executive director found out, he immediately canceled it, and he stated that the process had been, quote, subverted. Now, Brony clearly had significant authority within the Port Authority organization. But when someone questions how they're going to do something, has no idea how he's going to do something, has to lie in order to accomplish it, has to lie that his boss has approved it, has to conceal it from his boss, and has to avoid every legitimate process there is. Isn't it often the case that somebody who has the authority to do something may lie about why the person is doing the thing, because if the real reason was exposed, there would be a lot of – it would cause a furor. People would be angry. But that doesn't show the person doesn't have the authority to do it. A person hires his brother-in-law for a position. Why did you hire this particular person? Well, this person is the very best qualified person for this job. And the real reason is his wife wants him to do it. He doesn't want to say it – does that show he didn't have the authority to fill this position? No, Your Honor, but that's not the only piece of evidence we're relying on, and it's a different kind of lie. This isn't a lie about why they're doing it. This is a lie that Wildstein directly testified that they needed to tell in order to get the resources that they – that they needed. It was clearly important to the George Washington bridge manager and the manager of tunnels, bridges, and terminals that this was something the executive director knew about. Both the executive director and the vice chairman of the Port Authority Board of Commissioners testified that they would expect to be notified about something that was even in order of magnitude less disruptive than this was ever going to be, and they weren't notified. What do you do about this? This is the same. But I don't want to lose what the question was in light of the instructions given. And what I have so far found is that the defense did ask the jury to be instructed to do just what you want. They asked the jury – they said, judge, tell the jury that if the Port Authority granted or bestowed on the defendants the power or authority to control the property, the bridge, et cetera, and that they acted within the bounds of that authority, then you can't find the scheme to defraud. I think you agree with that, and the problem is the judge said, no, I won't give that instruction. Then what the judge gave as an instruction, insofar as the court of appeals – and we're reviewing the court of appeals – insofar as the court of appeals said, well, they gave the essence of it, this was the instruction supposed to be the essence of it. To establish a scheme to defraud, the government must also prove that the scheme contemplated depriving the authority – the Port Authority, the Port people – of money and property. What? That's the essence of what he didn't give? Now, I haven't read the two instructions you read, but the one that I read, I think, is the one that the court of appeals relied upon. So what do we do about that? Well, Your Honor, I would look back at the materiality instruction I was discussing with Justice Alito. But that isn't what the court of appeals relied on. Well, Your Honor, I think if the court of appeals got the substance of it right and you don't agree with its particular reasoning, there's no reason to reverse, particularly when the question hasn't even been presented to this Court. This question – this point was only really raised in the reply brief of Barone, who didn't even petition. But let me address the authority instruction that was rejected by the district court directly. That instruction was proposed in the context, primarily, of an instruction on 18 U.S.C. 666, which is the more general misappropriation of federal funds statute. And the instruction on that, which appears at page 870 of the joint appendix, already itself contains a reference to authority. Both the government and the district court were quite clear in the district court, and you'll see this finding by both the court of appeals and the district court, that Barone and Kelly were free to argue the authority issue. The only question was whether the jury was going to get a specific instruction on that point. And the government believed the instruction was unnecessary. It was in – it would have been a novel addition to the Third Circuit's pattern jury instruction on section 666. And, moreover, I don't know that their instruction was, in fact, correct, because it might have confused the jury into thinking, and this goes back to my colloquy with Justice Sotomayor, that if Barone had some authority under some circumstances, that that would exonerate all the defendants. But you say that the instruction – you thought the instruction was unnecessary. That may have been the case in light of your theory at the time. But surely, after your focus here on the authority point, you wouldn't make that same statement. Well, Your Honor, I think that, in retrospect, it may have been better to instruct the jury somewhat more specifically on authority. I don't know that their specific— Somewhat more specifically on the central point of your argument before us today. I don't know that their specific instruction would have accomplished it, and I don't know that the instructional issue is before the court – is before the court today. But we are defending this – these convictions on the precise same ground that they were found to be valid by both the court of appeals and the district court, which addressed the authority issue. The district court addressed the authority issue before trial, telling the defendants they could argue it at trial. It addressed it after trial, saying it believed that authority had been proven. And then the Third Circuit addressed it. And we have been consistent throughout, and that we have never argued, to my knowledge – and I certainly haven't identified a place where we have argued – that if Barone in fact had the authority that his counsel just claimed he had, which is to realign the lanes for any reason or no reason, that these defendants could— Mr. Fagan, nobody, no decision-maker has the authority to make any decision for no reason. That's a misnomer in terms. People have authority to do things only in the interest of the agency. So give me a line drawing of for reason or no reason, meaning I don't think anybody in the Port Authority, including the executive director, could on whim say, ah, you know, I like playing on a board. Let's change it to one lane because I'd just like to see a different pattern today. So my apologies, Your Honor. So give me your definition of what authorized means. If he had the ability – and when I first read your brief, it was if he had the ability to change the lanes on his own, then he had authority. Yeah. All right? Now, what the limits of that authority are is where I'm trying to get you. So, Your Honor, if he were the— How? But it can't be no authority because he never has authority. I apologize. I was simply repeating the language that the Court of Appeals itself used, which may have been a little hyperbolic. But if he were the person to whom the Port Authority entrusted the decision of whether there should be three lanes or one such that his decision under these circumstances would govern, then he had the authority. I think the evidence showed that he was not that person. Again, he had to lie about his boss— The fact that the executive director could overturn him doesn't prove the positive. That's right, Your Honor. We wouldn't rely on that piece of evidence alone. Just like Justice Alito, we're not relying alone on the fact that he told a lie. We're relying on a combination of circumstances. Again, as I was saying earlier, when an idea of something to do with my organization's resources is raised to me, and my initial reaction is, how are we going to do that? And then the idea is to tell a lie that will get everyone on board with it. And then we lie about the fact that my boss is aware of it and tacitly approves of it. We avoid every legitimate process, and we conceal it from my boss. I think a reasonable jury can rationally conclude that I'm doing something that I don't have the authority to do. And that's— Mr. Faix, please finish. Sorry. I was just going to say, and that's what Peroni did here. Apologies, Justice Kagan. Can I switch? Because the statute clearly says that a scheme of deception has to—the object of it has to be to obtain property. So can we talk about that for a minute? Because if I look at this, and I'm an ordinary juror, I'm thinking, you know, the object of this deception was not to obtain property. The object was to create a traffic jam. The object was to benefit people politically. You can frame the object in lots of ways. But notwithstanding that some employee time was given over to this scheme, that was not the object of the scheme, was it, to appropriate that employee time? Well, Your Honor, I think it was because this gets back to what I was saying to Justice Breyer earlier. This is a particular type of fraud where it's commandeering fraud, where what they're trying to do is to take property that's in the victim's hands—here, the Port Authority—and convert it to their own uses. It may be that if I take a knife off a table that doesn't belong to me and stab someone, my end goal is to stab someone, but I've still stolen the knife. But wasn't the commandeering here completely incidental, indeed unnecessary, to the scheme being carried out? In other words, you know, there was a little bit of time for an extra toll person actually to mitigate the problems of the traffic jam, or there were some people running around counting cars to conceal the purpose for what they were — of what they were doing, but that was not the object of the scheme. Now, Your Honor, the object of the scheme was for them to take control of real property, physical lanes accessing the George Washington Bridge, and have those lanes be allocated the way they wanted. Okay. So that's a different theory. That's not the employee time and labor. That's something about, like, appropriating the George Washington Bridge. Is that right? That is one— But it's not appropriating the George Washington Bridge. It's reallocating lanes on the George Washington Bridge, and I would have thought that Cleveland makes clear that that's not an appropriation of property either. Your Honor, I think it's both, because they needed the employee resources in order to accomplish what they were trying to do with the bridge. And if I could address Cleveland for a second. This case and Cleveland do both involve governmental decision-making, but that's where the similarities end. In Cleveland, the object of the scheme was to obtain a license under a regulatory scheme that had no private analog whatsoever. The Court rejected every private analog the government offered for it, and the license wasn't property in the government's hands. Here you're talking about real property, physical lanes, and who can access those lanes. And access rights to physical property are quintessential forms of private property, probably one of the oldest forms of property we have. And then you have the employee resources necessary to reallocate the lanes, which I think even they acknowledge are property under the fraud statute. They acknowledge that if you send painters to paint the mayor's house, that that's going to be property fraud because you're taking the employee services. Well, that's because the object of the scheme is to use the employee labor to get your house painted. But I don't think that you can say the same thing here. Your Honor, the reason you're not using the employee labor to create the traffic jam. They are using the employee labor as if it were theirs, not as if it were something that the Port Authority gets to use. So, again, in the private context, if I were to impersonate the boss and start ordering around the company jet, I think I have obtained the company jet and probably the pilot's time as well. You picked an example that is easy for you. I mean, the example that's hard for you, I think, is you tell the employee to pick up the phone and call somebody and say this. That's a bad thing. And then immediately you say, okay, it's property fraud because I've used the telephone. The employee has used the telephone or I've used the four minutes of that employee's time necessary to convey the message. Your theory would say that that's taking a property so it's covered by the fraud statutes. We wouldn't, Your Honor. And I'm actually glad to have a chance to make this perfectly clear. And this gets back to Justice Kagan's question as well. Incidental uses of property that are not the object of the scheme are not going to be sufficient for property fraud. And I think the easiest place to look for that is this Court's decision in Laughran, which involved bank fraud. And the Court said there that if you tell a lie and the object of your lie is to obtain money, it's not bank fraud simply because, unrelated to your lie, you didn't really care how the money came to you. The money comes to you in the form of a check, which is bank property, as opposed to in the form of cash, which isn't. If someone is – if someone tells a lie and the object is to obtain a license from the State of Louisiana to operate a video poker machine, which is not property, they are not committing property fraud just because some employee needs to spend some time processing the license. That's not the object. The object of the scheme was not to commandeer lanes on the bridge. The object was to cause a traffic jam in Fort Lee. And if they could have done it some other way, they would have done it some other way. The use of the traffic – you know, altering the traffic lane configuration was just the incidental means of achieving the objective. I don't think that's right, Your Honor. The lie they told to the Port Authority to get the Port Authority resources was to – a lie they told in order to get those resources. The causing of the traffic jam was what they wanted to accomplish with those resources. If I tell a lie to get access to the company Jet, it may be that my goal is to take it on a vacation trip to Macau, but that's not the object of the scheme as far as the fraud's concerned and the victim of the fraud. Thank you. Roberts. Thank you, counsel. Two minutes, Mr. Roth. Roth. Thank you. Your Honor, the Federal property fraud statute prohibits schemes to obtain property. And the government's theory of property here, as I think we just heard, is that the decision about lane alignment commandeered the control over the George Washington Bridge. That is exactly the type of regulatory control that Cleveland said is not property. Cleveland referred to the intangible rights of allocation, exclusion, and control. And the sovereign's intangible rights of allocation, exclusion, and control are not property for purposes of this statute. And therefore, if what the officials did was use deceit to influence the exercise of those rights, they have not obtained property from the Port Authority. If that is not correct, then everything an official does is – falls within the scope of this statute, and the only question that is open is was there some deceit involved. And if that is right, I think the chilling effect on honest public servants is going to be severe. Mr. Roth, you responded to one half of their theory. One half of their theory is the allocation of lanes. Yes. And the other half is the employee time. Yes. So what's your response to that? My response to that, well, it's actually what he said at the end, which is that the incidental costs of a decision are not the object – are not its object. And it's what Your Honor asked in the earlier question. The implementation of the regulatory decision is going to use some public resources. That cannot possibly change the result, or else Cleveland is a complete deadlift. Why do you call it incidental? I mean, it was essential to the scheme. Because it's incidental, Your Honor, in that it was the implementation cost. It flowed as a result of the regulatory decision. So the regulatory decision was to realign the lanes. That required some employee time in terms of taking tolls and studying the traffic effect. But that was not the object. That was how it got done. What if it cost a million dollars? Would it be incidental? No. Yes, Your Honor. It would still be incidental. It's not a de minimis test. It's a question of what is the object. Thank you. Thank you, counsel. The case is submitted.